1
2
3
4
5

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

6

JONATHAN JOE SKENANDORE,

7
                                             Petitioner,

8    v.

9    JEREMY BEAN[1], *et al.*,

10
                                             Respondents.

Case No. 3:21-cv-00330-ART-CSD

**ORDER**

11        Petitioner Jonathan Joe Skenandore filed a counseled first amended

12    petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 25. This

13    matter is before the Court for adjudication of the merits of the first amended

14    petition, which alleges that his guilty plea was involuntary because (1) he did not

15    understand all the elements of the crime; (2) his counsel rendered ineffective

16    assistance for providing advice based on a misunderstanding of first-degree

17    murder; and (3) his counsel rendered ineffective assistance for advising

18    Skenandore that he could not withdraw from the conspiracy. For the reasons

19    discussed below, the Court grants the petition on ground 1.

20    **I.    BACKGROUND[2]**

21

---

22    [1]  According to the state corrections department's inmate locator page,
      Skenandore is incarcerated at High Desert State Prison ("HDSP"). Jeremy Bean
23    is the current warden of that facility. At the end of this order, the Court directs
      the Clerk to substitute Jeremy Bean as respondent for Respondent Perry Russell.
24    *See* Fed. R. Civ. P. 25(d).

25    [2] The Court summarizes the relevant state court record for consideration of the
      issues. The Court makes no credibility findings or factual findings regarding the
26    truth or falsity of evidence or statements of fact in the state court. The Court
      summarizes the same solely as background to the issues presented in this case.
27    No assertion of fact made in describing statements, testimony, or other evidence
      in the state court, constitutes a finding by the Court unless expressly stated.
28    Failure to mention a category or piece of evidence does not signify it was
      overlooked in considering the claims.

1

### A.    Factual Background

Skenandore pled guilty to second-degree murder based on the shooting of Grant Watkins. During the evening of January 10, 2016, an individual named Jesus (("Jesus") also known as "Cheech") called Watkins, to purchase three ounces of marijuana from Watkins. ECF No. 34-2 at 78-79. Watkins was with a friend, Jonni Escobar ("Escobar"), who agreed to drive Watkins to conduct the transaction. *Id.* at 81.

A group of individuals were at the apartment of Reed Skenandore ("Reed"), Skenandore's brother. Brandon McGee ("Brandon"), Keenan Blackmore ("Keenan"), Jacob Huttman ("Jacob"), and Jacob's 17-year-old brother, were at Reed's apartment. *Id.* at 314-18. According to Brandon, Skenandore received a phone call and when he hung up, he informed the group that he had a way to "come up" off three ounces of marijuana. *Id.* at 319-20. After that discussion, Jesus arrived at the apartment and discussed a plan for the robbery. *Id.* at 322-23. The group, except for Brandon, then left Reed's apartment. *Id.* at 333-34.

Keenan, Reed, Skenandore, Jacob, and Jacob's juvenile brother got into Jacob's Toyota Corolla to drive to a park to meet Watkins. ECF No. 34-4 at 268-69. According to Keenan, Jacob was driving, Reed was in the front passenger seat, and Keenan, Skenandore, and Jacob's juvenile brother were in the back seat. *Id.* at 271. Jesus and another individual, Alan Garcia ("Alan"), were in a separate car, and met the Toyota near the park. *Id.* at 269-70.

Jesus exited the car he was in with Alan, and then entered the Toyota. *Id.* at 270. Because there were now six people in the car, Keenan and Jacob's juvenile brother exited the Toyota. *Id.* at 272. The Toyota proceeds to turn around the corner, but stops, and Skenandore exits the Toyota.[3] *Id.* at 273. Skenandore told Keenan that he exited the car because Watkins might recognize him. *Id.* at 274.

---

[3] When Skenandore exited the Toyota, he was about 200 yards away from where the shooting took place. ECF No. 32-44 at 47.

Skenandore left his .40 caliber firearm in the car with Jesus. *Id.* at 277.

Watkins and Escobar were in their vehicle waiting at the park. ECF No. 34-2 at 87. When the other car arrived at the park, they flashed their lights at Watkins and Escobar to signal their arrival. *Id.* at 92. Watkins exited the vehicle and walked towards the other vehicle. *Id.* When Watkins was in between both vehicles, the passenger and driver jumped out of the other vehicle, and Escobar heard a gunshot, and saw Watkins fall to the ground. *Id.* Escobar observed the passenger of the other vehicle grab the marijuana from Watkins's sweater pocket after Watkins fell to the ground. *Id.* at 93.

Escobar exited his vehicle and charged towards the driver of the other vehicle with a knife that Watkins had given him. *Id.* at 94. The driver yelled at Escobar and said, "back up, stay back." *Id.* Escobar continued to walk towards him, and then the driver pointed a gun at Escobar. *Id.* Escobar fell to the ground and heard two gunshots. *Id.* The driver and the passenger returned to their vehicle, made a U-turn, and stopped near mailboxes to pick something up off the ground. *Id.* at 100. When the shooter's vehicle left, Escobar maneuvered his car closer to Watkins, pulled Watkins into his car, and drove to the hospital. *Id.* at 102, 105. Watkins died from the gunshot wound. ECF No. 34-3 at 142.

Skenandore, Keenan, and Jacob's juvenile brother were walking towards the park and began running towards the park when they heard gunshots. ECF No. 34-4 at 277-79. Keenan observed a dark figure run toward another dark figure. *Id.* at 279. Keenan observed a second shooter pop out of the driver's side of the car and fire rounds directly in the air. *Id.* The shooter returned to his car, made a U-turn, and Keenan, Skenandore, and Jacob's juvenile brother hopped into the backseat. *Id.* at 282. Jesus was still in the backseat, Jacob was driving, and Reed was in the front passenger seat. *Id.* at 284.

As they drove away, Reed called Brandon and told him to meet them at Jacob's house. *Id.* at 286. During the conversation, Reed stated that he shot

somebody. *Id.* While at Jacob's house, Brandon observed Skenandore cleaning Reed's gun with bleach. ECF No. 34-2 at 346.

### B.    Procedural Background

A second amended complaint charged Skenandore with murder with use of a deadly weapon, robbery with use of a deadly weapon, destruction of evidence, and a gross misdemeanor. ECF No. 31-12 at 3. Following a preliminary hearing, the justice court bound over the charges to the district court. ECF No. 31-16.

In March of 2017, Skenandore entered into a guilty plea agreement where he pled guilty to second-degree murder and conspiracy to commit robbery as alleged in a second amended information, and in exchange the State agreed to dismiss or otherwise not pursue any other charges. ECF Nos. 31-49, 31-50. The state court sentenced Skenandore to 10 to 25 years for second-degree murder and a concurrent term of 12 to 48 months for conspiracy to commit robbery. ECF No. 32-4. Skenandore did not file a direct appeal.

In April 2018, Skenandore filed a state postconviction habeas petition. ECF No. 32-10. Following an evidentiary hearing, the state court denied his state postconviction habeas petition. ECF Nos. 32-44, 33-7. The Nevada Court of Appeals affirmed the denial of relief. ECF No. 33-28. On August 2, 2021, Skenandore initiated this federal habeas corpus proceeding *pro se.* ECF No. 1. Following appointment of counsel, Skenandore filed his first amended petition. ECF Nos. 15, 25.

## II.    GOVERNING STANDARD FOR REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (first quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and then citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75.

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## III.   DISCUSSION

### A.   Ground 1—validity of guilty plea re: understanding the elements of the crime and making a factual statement constituting an admission to the crime.

In ground 1, Skenandore alleges that he entered a plea that was not voluntary in violation of his due process rights under the Fifth and Fourteenth Amendments. ECF No. 25 at 5-8. He asserts that he did not understand all the elements of the crime and he did not make a factual statement constituting an admission of second-degree murder. *Id.* at 6-7. Under Nevada law, to be convicted

5

of second-degree murder, a defendant must harbor, either express or implied, malice aforethought. *See McCurdy v. State*, 809 P.2d 1265, 1266 (Nev. 1991). Because there was no allegation that Skenandore acted with express malice, he had to understand that he had to have acted with implied malice and that the factual admission had to support a finding of implied malice.[4] ECF No. 25 at 7. Skenandore alleges that his factual statement at the guilty plea canvass demonstrates that he lacked understanding as to the implied malice element because he did not provide sufficient facts to establish implied malice. *Id.* The second amended complaint did not plead that Skenandore acted with implied malice and did not plead any facts consistent with implied malice.

### 1.    Additional Background Information

#### a.    Guilty Plea

The second amended information, which listed Reed, Jesus, and Jacob Huttman as co-defendants, alleged:

> That the Defendant . . . along with [Reed, Jesus, and Jacob] . . . did willfully and unlawfully kill Grant Watkins, a human being, while in the perpetration or attempted perpetration of a ROBBERY, as defined by NRS 200.380, in the manner following: the Defendants set up a deal to purchase marijuana from Grant Watkins and induced Grant Watkins to meet at a location chosen by the Defendants, the said Defendants in fact planning to steal and rob marijuana from Grant Watkins, and in the course of the robbery, the Defendants acted with knowledge of the facts and in concert with other defendants who caused the death of Grant Watkins by brandishing and/or discharging a firearm at Grant Watkins, causing a mortal wound to Grant Watkins, after which the Defendants did take a green leafy substance believed to be marijuana from the person or in the presence of Grant Watkins. . .

ECF No. 31-48 at 3.

In the guilty plea memorandum, Skenandore affirmed that he discussed the elements of the original charge against him with his attorney and that he

---

[4] Under Nevada law, implied malice is established "when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." NRS § 200.020(2).

understood the nature of the charge against him. ECF No. 31-49 at 5. He affirmed that "all of the foregoing elements, consequences, rights, and waiver of rights have been thoroughly explained to me by my attorney." *Id.* Attached to the guilty plea memorandum is a certificate of Skenandore's counsel, in which counsel stated that he fully explained to Skenandore the allegations contained in the charge to which the guilty plea is being entered. *Id.* at 7.

At the plea canvass, Skenandore affirmed that he read the guilty plea memorandum before he signed it. ECF No. 31-50 at 9. He also affirmed that he understood the memorandum and that his counsel answered any questions he had before signing the memorandum. *Id.* The state court read the allegations to the charge in the second amended information and Skenandore indicated that he understood the charge. ECF No. 31-50 at 6. The state court instructed Skenandore to state what he did, and after his counsel asked the state court for a moment, Skenandore responded, "I was involved with some people who went to go rob some guy, Grant, for marijuana, and he ended up getting shot that night." *Id.* at 14. Skenandore admitted that he agreed with those other people to take personal property from Watkins by means of force or violence or fear of injury. *Id.* Skenandore was nineteen at the time of the guilty plea canvass and had completed his GED. *Id.* at 14-15.

### b.    Postconviction Evidentiary Hearing

At the postconviction evidentiary hearing, Skenandore testified that he pled guilty on the advice of counsel. ECF No. 32-44 at 118. He further testified that he was nineteen at the time that he pled guilty. *Id.* at 119. Skenandore did not believe he was guilty of murder at the time. *Id.* Skenandore further testified that his counsel informed him that if there was a conspiracy that he would be liable for anything that happened, even if Skenandore did not pull the trigger. *Id.* at 120. Skenandore thought that somebody was going to come to the window, give Jesus the marijuana, and that they were going to drive off. *Id.* at 121. Skenandore

testified that he did not know Watkins was involved at first, but once he learned Watkins was involved, he told Jesus he couldn't do it because he knew Watkins and got out of the car. *Id.* at 123. Jesus asked Skenandore to leave his gun with him. *Id.* at 124.

Skenandore testified that while discussing the decision to plead guilty, his counsel told him about implied malice, but "he never really explained the full extent of what it meant." ECF No. 32-44 at 145. Skenandore further testified that he did not understand implied malice when he pled guilty to second-degree murder. *Id.*

Skenandore's counsel, Richard Davies ("Davies"), testified at the postconviction evidentiary hearing. *Id.* at 7. Davies testified that prior to the change of plea hearing, he reviewed the criminal information with Skenandore. *Id.* at 73. He testified that he reviewed the plea memorandum with Skenandore and talked about what Skenandore would be pleading to. *Id.*

### 2.   Standard for a Valid Guilty Plea

The federal constitutional guarantee of due process requires that a guilty plea be knowing, intelligent, and voluntary. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). Where a defendant pleads guilty to a crime without having been informed of the crime's elements, this standard is not met, and the plea is invalid. *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005). The constitutional prerequisites of a valid plea may be satisfied where the record accurately reflects the nature of the charge, and the elements of the crime were explained to the defendant by his own, competent counsel. *Id.* But even where the record does not expressly show that the trial judge or defense counsel explained the elements of the charges to the defendant,

1   there is a presumption that "defense counsel routinely explain the nature of the

2   offense in sufficient detail to give the accused notice of what he is being asked to

3   admit." *Henderson v. Morgan*, 426 U.S. 637, 647 (1976).

4       In *Henderson*, the Supreme Court vacated a guilty plea to a charge of

5   second-degree murder, finding that the petitioner did not receive adequate notice

6   of the intent element of the crime. 426 U.S. at 637. The petitioner in *Henderson*

7   had originally been indicted on a charge of first-degree murder but pleaded guilty

8   to second-degree murder. *Id.* at 638. As second-degree murder was never formally

9   charged, the petitioner did not receive notice that second-degree murder required

10  proof of intent. *Id.* at 645. The guilty plea was found defective because "the trial

11  judge found as a fact that the element of intent was not explained to [the

12  petitioner]" and "[the petitioner's] unusually low mental capacity provides a

13  reasonable explanation for counsel's oversight." *Id.* at 647.

### 3.  State Court Decision

15  The Nevada Court of Appeals held:

> Skenandore also argued his plea was unknowingly entered because
> he did not understand the implied malice element of second-degree
> murder. "This court will not invalidate a plea as long as the totality
> of the circumstances, as shown by the record, demonstrates that the
> plea was knowingly and voluntarily made and that the defendant
> understood the nature of the offense and the consequences of the
> plea." *State v. Freese*, 116 Nev. 1097, 1105, 13 P.3d 442, 448 (2000).
> In the case of felony murder, "[t]he felonious intent involved in the
> underlying felony may be transferred to supply the malice necessary
> to characterize the death a murder." *Collman v. State*, 116 Nev. 687,
> 713, 7 P.3d 426, 442 (2000). In the second amended criminal
> information, the State alleged Skenandore had the intent to commit
> robbery and the victim was killed during the commission of the
> robbery. At the plea canvass, the district court reviewed the
> allegations contained within the second amended criminal
> information, including Skenandore's intent to commit robbery. In
> response, Skenandore acknowledged that he understood the charge
> and that he committed the acts described in the second amended
> information. Given Skenandore's admission that he had the
> felonious intent to commit robbery, he thus also acknowledged he
> acted with malice necessary to characterize the victim's death a
> murder. In light of Skenandore's acknowledgments at the plea
> canvass, the totality of the circumstances demonstrate that his guilty
> plea was knowingly and voluntarily entered, and that he understood
> the nature of the offense and the consequences of his plea. Therefore,

the district court did not err by denying this claim.

ECF No. 33-28 at 5-6.

### 4.    De Novo Review

Skenandore argues the Court should review Ground 1 *de novo* because the Nevada Court of Appeals' decision was unreasonable. He asserts that although the first-degree felony murder statute allows for implied malice based on the intent to commit an underlying and qualifying felony, second-degree felony murder requires an additional factual element to establish either express or implied malice. ECF No. 41 at 19. The Court finds that the Nevada Court of Appeals' determination is unreasonable because an admission that Skenandore had felonious intent to commit robbery does not demonstrate that he understood the implied malice element of second-degree murder or establish a factual basis for the plea to that charge. Therefore, the Nevada Court of Appeals' finding that Skenandore's "guilty plea was knowingly and voluntarily entered, and that he understood the nature of the offense," was based on an unreasonable determination of the facts that is established by clear and convincing evidence in the state-court record. 28 U.S.C. § 2254(d)(2); (e)(1). As such, the Court will review Ground 1 *de novo. See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires").

### 5.    Conclusion

Pursuant to Nevada law, to be guilty of second-degree murder Skenandore must have caused the death of another human being while having "malice aforethought, either express or implied." NRS § 200.010; *See also McCurdy,* 809 P.2d at 1266. "Robbery is the unlawful taking of personal property from the person of another, or in the person's presence, against his or her will, by means of force or violence or fear of injury, immediate or future, to his or her person...at the time of the robbery." NRS § 200.380.

Skenandore's conviction for conspiracy to commit robbery could not supply the malice required for his plea to second-degree murder under a second-degree felony murder theory of liability unless he admitted that he committed an inherently dangerous (and non-assaultive) predicate felony and there is an immediate and direct causal relationship between his acts and the victim's death. *See Ramirez v. State*, 235 P.3d 619, 622 (Nev. 2010) (explaining these elements are required for an instruction on second-degree felony murder). *See also Rose v. State*, 255 P.3d 291, 295 (Nev. 2011) (explaining that for second-degree felony murder, two elements must be satisfied: (1) the predicate felony must be inherently dangerous, where death or injury is a directly foreseeable consequence of the illegal act, and (2) there must be an immediate and direct causal relationship—without the intervention of some other source or agency—between the actions of the defendant and the victim's death); *See also Labastida v. State*, 986 P.2d 443, 448-49 (Nev. 1999).

The Nevada Supreme Court in *Rose* refined *Ramirez's* requirements for second-degree felony murder by adopting a merger doctrine, that provides that an assaultive felony merges with the murder and cannot provide a basis for a conviction for second-degree felony murder. *See Rose*, 255 P.3d at 295-98. *Rose* also held that the determination whether a crime is assaultive in nature is not a legal determination based on the definition of the predicate felony; rather, the determination whether the predicate felony is assaultive is a fact determination that is based "on the manner in which the felony was committed." *Id.* 297-98.[5]

The Court acknowledges that Skenandore affirmed that he read the guilty plea memorandum. The guilty plea memorandum provides that Skenandore

---

[5] Alternatively, implied malice to support Skenandore's conviction for second-degree murder required the State allege and Skenandore admit he acted with extreme recklessness regarding the risk to and conscious disregard for human life. *See Collman v. State*, 116 Nev. 687, 715-18 & n.13, 7 P.3d 426, 444-45 & n.13 (2000).

discussed the elements of "the original charge" against him with his attorney and that he understands the nature of the charge against him. In addition, there is a certificate executed by Skenandore's counsel attached to the guilty plea memorandum providing that counsel fully explained the allegations contained in the charge to which Skenandore pled guilty. Skenandore testified that his counsel told him about implied malice, even though "he never really explained the full extent of what it meant." ECF No. 32-44 at 145.

At the time of his plea canvass, however, Skenandore was only nineteen years old with a GED. Skenandore did not admit to having a specific intent to kill or that he killed the victim. In addition, the second amended information, which the state court read at the plea canvass, did not plead that Skenandore acted with implied malice. Further, neither the Court's questioning nor Skenandore's statement of his actions at the plea canvass establishes that he understood the element of implied malice. Skenandore's statement at the plea canvass that "[he] was involved with some people who went to go rob some guy, Grant, for marijuana, and [Grant] ended up getting shot that night," provides a factual basis for felony murder, but not implied malice to support second-degree felony murder. These factors as well as the fact that Skenandore testified at the postconviction evidentiary hearing that he did not have an understanding of implied malice at the time that he pled guilty to second-degree murder supports the conclusion that Skenandore did not receive adequate notice of the offense to which he pled guilty. Accordingly, based on the record and considering the totality of the circumstances, the Court finds that his plea was involuntary, and the judgment of conviction was entered without due process of law. *Boykin*, 395 U.S. at 242. Skenandore is entitled to federal habeas relief for ground 1.

**B.    Ground 2—validity of guilty plea re: counsel's advice was based on a misunderstanding of first-degree murder.**

In ground 2, Skenandore alleges that his guilty plea was not voluntary

because counsel rendered ineffective assistance for advising Skenandore to plead guilty based on a misunderstanding of first-degree murder. ECF No. 35 at 8. Skenandore asserts that his counsel's primary motivation for advising him to plead guilty was because his case was death penalty eligible, even though that was no longer a substantial risk when Skenandore pled guilty. *Id.* at 15-16. Skenandore further asserts counsel's advice was ineffective because Skenandore did not participate in the robbery, so he could not be vicariously liable for murder, a specific intent crime, and, he had planned to commit a grab-and-go, i.e., a larceny, rather than robbery, and larceny is not a predicate felony for first-degree felony murder. *Id.* at 16-17.

### 1.    Additional Background Information

#### a.    Preliminary Hearing Testimony

Brandon testified at the preliminary hearing that while he was at Reed's apartment, Skenandore received a phone call and when he hung up, he informed the group that he had a way to "come up" off three ounces of marijuana. ECF No. 34-2 at 320. He admitted that the phrase "come up off of" doesn't necessarily mean to rob someone but could also mean getting a good deal. ECF No. 34-3 at 121-22. He testified that he had the impression that they were going to rob someone that night, in that they were going to look at the weed and run off. *Id.*

Brandon further testified that Reed grabbed a ski mask, and that Skenandore and Jake may have also had masks. ECF No. 34-2 at 329-30. He did not see anyone with weapons, but knew that Reed, Skenandore, and Jake generally carried guns tucked in their pants. *Id.* at 330-31. Brandon stayed in the apartment while everyone else left. *Id.* 334, 341. After hearing gunshots, Brandon called Reed, who said that he shot somebody. *Id.* at 342. Keenan testified at the preliminary hearing that while he was at Reed's apartment, Jesus arrived at the apartment and mentioned to the group that he had a "quick come up." ECF No. 34-4 at 261. Keenan described a "come up" as grabbing and taking

13

something. *Id.* Keenan reiterated that Jesus stated that he had a "come up," and not Skenandore. ECF No. 34-5 at 21-22. The group left the apartment to go to the park and Keenan testified that no one wore a ski mask or bandana. *Id.* at 121-22. Skenandore told Keenan that he exited the car near the park because Watkins might recognize him. ECF No. 34-4 at 274.

### b.    Postconviction Evidentiary Hearing Testimony

Davies testified that he advised Skenandore to plead guilty to second degree murder because Skenandore "was originally looking at [a] potential death penalty involved in a conspiracy or involving a felony murder case." ECF No. 32-44 at 9. He acknowledged that when the 30-day deadline from the filing of the information to file notice of intent to seek death penalty passed that it was clear that the death penalty was "off the table." *Id.* at 10.

He further testified that he advised Skenandore to plead guilty because he was very likely going to be found guilty of felony murder based on the theory that Skenandore joined a conspiracy to commit a robbery, which would carry a potential of at least 40 years in prison for the use of a weapon. *Id.* at 11. He testified that Skenandore acted in reckless disregard for the life of Watkins by handing a firearm to a passenger in the vehicle when they were going to rob Watkins. *Id.* at 15. Davies testified that he considered the defense that Skenandore committed conspiracy to commit larceny or a "grab and go", rather than a robbery. *Id.* at 20. He believed that there was intent to use force to take and that amounted to a robbery. *Id.* at 24.

Skenandore testified that Davies never discussed the concept of larceny from a person not amounting to robbery with him. *Id.* at 123. He would not have pled guilty if he had known that a larceny not amounting to robbery is not a predicate felony for first-degree murder. *Id.*

### 2.    Standard for Ineffective Assistance of Counsel Claims

In *Strickland*, the Supreme Court propounded a two-prong test for analysis

of ineffective assistance of counsel claims requiring Petitioner to demonstrate that: (1) the counsel's "representation fell below an objective standard of reasonableness[;]" and (2) the counsel's deficient performance prejudiced Petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Courts considering an ineffective assistance of counsel claim must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. It is Petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland,* it is not enough for Petitioner to "show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, errors must be "so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687.

When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires the petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012) ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice."). "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill,* 474 U.S. at 59. This is an objective analysis that requires us to examine what a reasonable person would do "without regard for the idiosyncrasies of the particular decisionmaker." *Id.* at 60; *Langford v. Day*, 110 F.3d 1380, 1388 (9th

Cir. 1996) (denying claim of ineffective assistance of counsel because the record supported the state court's finding that the petitioner would have pled guilty even had he been offered a defense psychiatrist).

In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *See Richter*, 562 U.S. at 104-05; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted). The Court further clarified, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 3.    State Court Decision

The Nevada Court of Appeals held:

> Skenandore argued his counsel was ineffective for misunderstanding the law regarding first-degree murder, causing counsel to improperly advise Skenandore to plead guilty to second-degree murder. Skenandore asserted that the facts of the offense would not have supported a conviction for first-degree murder and counsel should not have advised him to plead guilty to second-degree murder.
>
> The district court found that the record and the evidence produced at the evidentiary hearing demonstrated there was overwhelming evidence that Skenandore was guilty of felony murder. This finding is supported by substantial evidence in the record: Skenandore agreed to participate in a robbery of the victim, the victim died as a result of a gunshot wound that occurred during the robbery, and Skenandore actively participated in the commission of the crimes. *See* NRS 195.020 (stating that those aiding and abetting the commission of the crime shall be punished as a principal even if not directly committing the crime or were absent during its commission); NRS 200.030(1)(b) (defining first-degree murder as murder committed in the perpetration of a robbery); *Burnside v. State*, 131 Nev. 371, 394-95, 352 P.3d 627, 644 (2015) ("[R]obbery [is] an appropriate felony to support a felony-murder charge."). Accordingly, Skenandore failed to demonstrate counsel's advice to plead guilty to second-degree murder rather than proceed to trial to face a charge of first-degree murder with the use of a deadly weapon was objectively unreasonable. *See Thomas v. State*, 120 Nev. 37, 44, 83 P.3d 818, 823 (2004) ("Judicial review of a lawyer's representation is highly deferential, and a claimant must overcome the presumption that a challenged action might be considered sound strategy."). And he failed to demonstrate a reasonable probability he would have

refused to plead guilty and would have insisted on proceeding to trial had counsel offered different advice regarding the plea offer. Therefore, we conclude the district court did not err by denying this claim.

ECF No. 33-28 at 3-4.

### 4. Conclusion

The state court's rejection of Skenandore's ineffective assistance of counsel claim was neither contrary to nor an objectively unreasonable application of clearly established law as determined by the United States Supreme Court. The Nevada Court of Appeals' determination that Skenandore failed to demonstrate his counsel was deficient was not an unreasonable application of the performance prong of *Strickland*. Having reviewed the record, including counsel's testimony that he advised Skenandore to plead guilty because Skenandore would likely be found guilty of felony murder, which carried the potential sentence of at least 40 years in prison for the use of a weapon, the Court concludes counsel did not perform deficiently. Counsel's representation did not amount to "incompetence under prevailing professional norms." *Richter*, 562 U.S. at 104.

The Nevada Court of Appeals reasonably found that Skenandore would not have pleaded differently and insisted on going to trial if his counsel advised him differently regarding first-degree murder. To succeed on such a theory, the "petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). To find prejudice under these circumstances would require the Court to conclude counsel would have changed his recommendation as to the plea based on the defenses proffered by Skenandore, which, in turn, depends on the likelihood such defenses would have succeeded at trial. *Hill*, 474 U.S. at 59.

Skenandore relies on *Bolden v. State*, 124 P.3d 191 (Nev. 2005), for the defense that he cannot be vicariously liable for a specific intent crime, such as first-degree murder, unless he possessed the requisite statutory intent. Robbery is a general intent offense. NRS § 200.380. Under Nevada state law, the felony

murder rule subjects all participants[6] in a crime to criminal liability for any murder committed during the chain of events that constitutes an enumerated crime, such as robbery. *See, e.g., Echavarria v. State*, 839 P.2d 589, 599 (Nev. 1992). The intent required for the underlying felony, such as that required for an underlying robbery, "[i]s deemed, by law, to supply the malicious intent necessary to characterize the killing as a murder, and because felony murder is defined by statute as first-degree murder, no proof of the traditional factors of willfulness, premeditation, or deliberation is required for a first-degree murder conviction." *State v. Contreras*, 46 P.3d 661, 662 (Nev. 2002).

Given the evidence, a reasonable juror could find Skenandore guilty beyond a reasonable doubt of first-degree murder under Nevada's felony murder rule on the basis that, as stated by the Nevada Court of Appeals, Skenandore agreed to participate in a robbery of the victim, the victim died because of a gunshot wound that occurred during the robbery, and Skenandore actively participated in the commission of the crime. Although Skenandore was 200 yards away from the crime scene, the State could present evidence that he handed his gun to Jesus before leaving the car, that he left the car to prevent being recognized, and argue that he remained close-by as back-up.

Skenandore relies on *Nay v. State*, 167 P.3d 430 (Nev. 2007) to argue that malice may not be implied for felony murder if the accused did not intend to commit the robbery at the time of the killing. ECF Nos. 52; 55 at 15.[7] *Nay*, however, held that "for purposes of the first-degree felony-murder statute, the intent to commit the predicate enumerated felony must have arisen *before or*

---

[6] A "principal" or participant is "every person concerned in the commission of a felony … whether the person directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who, directly or indirectly, counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony…" NRS § 195.020.

[7] At oral argument, the Court permitted the parties to file supplemental briefing on this issue and they did so. ECF Nos. 52; 53.

*during* the conduct resulting in death." *Nay*, 167 P.3d at 431 (emphasis added). Counsel's advice is consistent with *Nay*. As discussed, counsel could conclude that reasonable inferences can be drawn that Skenandore shared the intent to commit the robbery before and during the conduct that resulted in death, thereby supporting malice for first-degree murder.

Although Jesus, Keenan, and Skenandore testified the plan was to commit a grab-and-go, which counsel could have argued at trial was a larceny and therefore not a predicate felony for felony-murder, the State nonetheless could have argued Skenandore committed robbery, highlighting he was instrumental along with Jesus in the robbery by discussing the plan with the group, bringing a gun while driving to the meeting spot, and handing his gun to Jesus upon realizing he may be identified. *See* ECF No. 33-7 at 14. Because a rational trier of fact could find beyond a reasonable doubt that Skenandore is guilty of aiding and abetting, if not conspiring, to commit robbery, the predicate for felony-murder, Skenandore fails to show prejudice.

The slim potential for success cannot render a conclusion that Skenandore suffered prejudice because his attorney did not recommend going to trial to present the defenses that Skenandore lacked specific intent to commit first-degree murder under *Bolden* or that Skenandore planned to commit larceny not amounting to a robbery. Had Skenandore rejected the plea agreement and proceeded to trial, he would have faced a first-degree murder felony charge and would not have gained the benefit of reduced exposure at sentencing. Accordingly, Skenandore is not entitled to federal habeas relief for ground 2.

## C. Ground 3—validity of guilty plea re: counsel's advice as to withdrawing from the conspiracy.

In ground 3, Skenandore alleges his guilty plea was not voluntary because counsel rendered ineffective assistance by advising Skenandore he could not withdraw from the conspiracy unless he took proactive steps to end the

conspiracy. ECF No. 25 at 18. Skenandore asserts counsel failed to advise that he had a valid defense that he withdrew from the conspiracy because he did not want to participate in a crime against someone he knew. ECF No. 41 at 27. He adds that Jesus denied receiving a gun from Skenandore and even if Skenandore left the gun in the car, it was not used during the robbery. *Id.* at 27-28.

### 1.    Additional Background Information

#### a.    Preliminary Hearing Testimony

Keenan and Jacob's juvenile brother exited the car before it reached the meeting spot at the park. ECF No. 34-4 at 272. At the preliminary hearing, Keenan testified that shortly after he exited the car, Skenandore also exited the car. *Id.* at 273. When Keenan asked Skenandore why he got out of the car, Skenandore said that Jesus said that Grant would recognize Skenandore, so Jesus told him to get out. *Id.* at 274. Keenan, Skenandore, and Jacob's juvenile brother walked down the street towards the park. *Id.* at 276. Keenan did not know if anyone had any weapons when they left the apartment to head to the park. *Id.* Keenan also testified, however, that Skenandore left his gun in the car with Jesus when Skenandore left the car. *Id.* at 277.

#### b.    Postconviction Evidentiary Hearing Testimony

At the postconviction evidentiary hearing, Davies testified that he informed Skenandore that Skenandore was liable for any other co-conspirator's actions through the course of the conspiracy. ECF No. 32-44 at 24. He testified that based on his research, he had a hard time finding support for the argument that Skenandore withdrew from the conspiracy. *Id.* at 40-41. Davies was not aware of the argument that an individual leaving a conspiracy is liable for conspiracy, but not the subsequent crime. *Id.* at 46-47. Davies did not believe that Skenandore withdrew or renounced the conspiracy and that Skenandore got out of the car because he was concerned that Watkins would identify him and stayed close in the vicinity as back-up. *Id.* at 47. He testified that in his opinion, Skenandore

continued the conspiracy by leaving his gun in the car with Jesus. *Id.*

Skenandore testified at the postconviction evidentiary hearing that once he learned Watkins was involved, he told Jesus he couldn't do it because he knew Watkins and got out of the car. *Id.* Skenandore communicated to the group that he wasn't going to be part of it. *Id.* at 126. Davies informed Skenandore that he had to do more than communicate that he wasn't a part of the conspiracy, such as call the police. *Id.* Skenandore testified that he would not have pled guilty if he had known that to withdraw from a conspiracy, he had to communicate his intent to withdraw and then not do anything after that in furtherance of the conspiracy. *Id.*

Skenandore testified that he always carried a gun for protection. *Id.* at 125. He further testified that he gave his gun to Jesus before leaving the car because Jesus asked him to and that Jesus said, "just in case." *Id.* at 124. He thought Jesus implied that he wanted the gun in case "something bad happens…" *Id.*

### 2.   Law Related to Conspiracy[8]

If one member of a conspiracy withdraws from the agreement before an overt act in furtherance of the conspiracy's target crime(s) has been committed by any member of the conspiracy, the withdrawing member is not responsible for the future crime(s) of his co-conspirators. Withdrawal from a conspiracy requires the following elements:

(1) that the Defendant completely withdraw from the agreement. A partial or temporary withdrawal is not enough;

(2) that the Defendant took affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy;

(3) that the Defendant made a reasonable effort to communicate those acts to his co-conspirators or that he disclosed the scheme

---

[8] Because there does not appear to be a statutory definition or relevant state case law defining withdrawal from conspiracy at the relevant time, the Court cites the recently adopted Nevada Criminal Pattern Jury Instructions. Nevada Pattern Jury Instructions: Criminal § 3.12 (State Bar of Nevada 2023).

to law enforcement authorities; and

(4) that the Defendant withdrew before any member of the group committed an overt act in furtherance of the conspiracy.

An affirmative step would include an act that is inconsistent with the purpose of the conspiracy and is communicated in a way that is reasonably likely to reach the other members. But some affirmative step is required. A mere cessation of activity in the conspiracy, or just avoiding the other members of the group, is not sufficient to establish withdrawal. *See Smith v. United States*, 568 U.S. 106 (2013); *United States v. Lova*, 807 F.2d 1483, 1493 (9th Cir. 1987); *United States v. Krasn*, 614 F.2d 1229, 1236 (9th Cir. 1980); *States v. Basey*, 613 F.2d 198, 202 (9th Cir. 1979), cert denied, 446 U.S. 919 (1980).

### 3.     State Court Determination

The Nevada Court of Appeals held:

> Skenandore argued that his counsel was ineffective for improperly advising him regarding the law concerning withdrawal from a conspiracy. Skenandore contended that he withdrew from the conspiracy prior to the commission of the robbery, counsel did not properly advise him regarding the issue, and counsel's improper advice caused him to agree to enter a guilty plea.

> At the evidentiary hearing, counsel testified that he reviewed the facts of the offense and concluded Skenandore did not withdraw from the conspiracy to rob the victim. Counsel testified that the facts of the case demonstrated Skenandore was an active participant in the planning of the offense and only did not proceed to the scene of the robbery out of concern that the victim would identify him. Because counsel concluded that Skenandore's actions did not constitute a withdrawal from the commission of the crimes, counsel believed it was likely that Skenandore would be found guilty of first-degree murder if Skenandore proceeded to trial. Accordingly, counsel advised Skenandore to accept the State's plea offer of second-degree murder. Counsel's advice was reasonable in light of the circumstances in this case. Accordingly, Skenandore failed to demonstrate his counsel's performance fell below an objective standard of reasonableness or, in light of the overwhelming evidence of his guilt, a reasonable probability he would have refused to plead guilty and would have insisted on proceeding to trial had counsel offered different advice regarding the plea offer. Therefore, we conclude the district court did not err by denying this claim.

ECF No. 33-28 at 4-5.

//

### 4.    Conclusion

The state court's rejection of Skenandore's ineffective assistance of counsel claim was neither contrary to nor an objectively unreasonable application of clearly establish law as determined by the United States Supreme Court.

Skenandore testified at the postconviction evidentiary hearing that his counsel informed him that, to withdraw from the conspiracy, he had to do more than communicate he wasn't a part of the conspiracy, such as call the police. Counsel determined that Skenandore did not withdraw from the conspiracy based on the evidence showing Skenandore got out of the car because he was concerned that Watkins would identify him, he stayed in the vicinity as back-up, and Skenandore continued the conspiracy by leaving his gun in the car with Jesus. Counsel's advice related to withdrawing from the conspiracy does not fall "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.*

Even if Skenandore could show counsel's advice was deficient, he failed to demonstrate that, but for counsel's alleged deficient conduct, Skenandore would not have pled guilty and would have insisted on going to trial. As stated by the Nevada Court of Appeals, there was evidence to support the argument that Skenandore was an active participant in the planning of the offense and did not proceed to the scene of the robbery only out of concern that the victim would identify him. Further, as Skenandore testified, he gave his gun to Jesus before he left the car. Given the evidence, the State could have argued at trial that Skenandore did not withdraw from the conspiracy and a reasonable jury could have found Skenandore guilty of first-degree murder. The Nevada Court of Appeals reasonably found Skenandore failed to demonstrate a reasonable probability that counsel's alleged deficient conduct would cause a rational defendant in Skenandore's situation to plead not guilty and proceed to trial. *See*

*Hill*, 474 U.S. at 59-60. Skenandore is denied federal habeas relief for ground 3.

## IV.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Petitioner. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability ("COA"). Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner has made "[a] substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying these standards, this Court finds that a certificate of appealability is unwarranted.

## V.    CONCLUSION

It is therefore ordered that the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 25) is conditionally granted as to ground 1 and denied as to the remaining grounds. Petitioner Jonathan Joe Skenandore's judgment of conviction filed on May 4, 2017, in case number 16 CR 00062.006 1B in the First Judicial District Court for the State of Nevada is vacated. Skenandore's guilty plea is vacated. Petitioner Jonathan Joe Skenandore will be released from custody, restraint, and/or continuing consequences from the conviction within 90 days of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, unless the State through the respondents files within the 90 day period a written election in this matter to commence trial proceedings against Skenandore regarding the March 17, 2017, second amended criminal information accusing Skenandore of second-degree

murder and conspiracy to commit robbery, and thereafter commences jury selection within 120[9] days following the election to try Skenandore.

It is further ordered that a certificate of appealability, to the extent that one is required, is denied as to all claims as to which relief has been denied.

It is further ordered that the Clerk of the Court (1) substitute Jeremy Bean as respondent for Respondent Perry Russell, (2) enter judgment accordingly, (3) provide a copy of this order and the judgment to the Clerk of the First Judicial District Court for the State of Nevada in connection with the court's case number 16 CR 00062.006 1B, and (4) close this case.

Dated this 28th day of March 2025.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

---

[9] Reasonable requests for modification of this time may be made by either party.